# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ST. MICHAEL'S MEDICAL CENTER, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-1484 (EGS) |
| MICHAEL O. LEAVITT, Secretary, U.S. Department of Health and Human Services, | ) ) ) ) | **ECF** |
| Defendant. | ) ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant, Michael O. Leavitt, Secretary of Health and Human Services, by and through his undersigned counsel, respectfully moves this Court for summary judgment on the grounds that there are no material facts in dispute and that Defendant is entitled to judgment as a matter of law. In support of the instant motion, the Court is respectfully referred to the accompanying Statement of Material Facts As to Which There Is No Genuine Issue, and Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment. A proposed order is also attached.

Dated: June 3, 2008

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

      /s/
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372


      /s/
JOCELYN S. BEER
Attorney
U.S. Department of Health & Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Avenue S.W.
Room 5309
Washington, D.C. 20201
(202) 305-3564

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
     and Human Services

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ST. MICHAEL'S MEDICAL CENTER, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| MICHAEL O. LEAVITT, Secretary, U.S. Department of Health and Human Services, | ) ) ) ) |
| Defendant. | ) ) ) |

Case No. 1:07-cv-1484 (EGS)

**ECF**

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, submits the following statement of material facts as to which there is no genuine issue in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

1.    Plaintiffs are twenty two urban hospitals located in multiple Metropolitan Statistical Areas (MSAs) in New Jersey, New York, and Connecticut that participate in the Medicare program, Complaint ¶ 3; Complaint, Civil No. 07-2036, ¶ 4, and receive payment under the Prospective Payment System (PPS).  Complaint ¶ 6; Complaint, Civil No. 07-2036 ¶ 6.

2.    Plaintiffs are located in urban areas from which at least one hospital has reclassified to another area for Medicare reimbursement purposes.  Complaint ¶¶ 15, 20; Complaint, Civil No. 07-2036 ¶¶ 15, 20.

3.    Plaintiffs submitted cost reports requesting Medicare reimbursement for fiscal years (FY) 2000 and 2001 to their fiscal intermediaries, but Plaintiffs were dissatisfied with the amounts they received.  Complaint ¶¶ 15, 20; Complaint, Civil No. 07-2036, ¶¶ 15, 20.

4.      Plaintiffs were dissatisfied because they believed the Secretary had improperly calculated a statutory adjustment factor reflecting the relative hospital wage level in Plaintiffs' geographic area as compared to the national average hospital wage level, known as the wage index, by removing data from reclassified hospitals from the area average.  *Id.*

5.      Plaintiffs appealed their Notices of Program Reimbursement for FY 2000 and 2001 to the Provider Reimbursement Review Board (PRRB), an administrative tribunal within HHS, and asked that their wage index claims be consolidated into group appeals for FY 2000 and FY 2001. Complaint at ¶ 15, Complaint, Civil No. 07-2036, ¶ 15.

6.      On July 16, 2007, the PRRB determined that the FY 2001 case was appropriate for expedited judicial review (EJR) under 42 U.S.C. § 1395oo(f)(1) because it constituted a challenge to an agency rule.  Administrative Record at 2.

7.      On November 5, 2007, the PRRB determined that the FY 2000 case also was appropriate for EJR.  Administrative Record, Civil No. 07-2036, at 2; Complaint, Civil No. 07-2036, ¶ 15.

8.      Plaintiffs filed a complaint seeking additional Medicare payments for FY 2001 as civil action number 07-1484 in this Court on August 17, 2007.  Complaint ¶ 6.

9.      Plaintiffs filed a complaint seeking additional Medicare payments for FY 2000 as civil action number 07-2036 in this Court on November 9, 2007.  Complaint, Civil No. 07-2036, ¶ 6.

Dated: June 3, 2008                                 Respectfully submitted,

                                                    ___/s/_____
                                                    JEFFREY A. TAYLOR
                                                    United States Attorney
                                                    D.C. Bar No. 498610

      /s/                     
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372


      /s/                     
JOCELYN S. BEER
Attorney
U.S. Department of Health & Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Avenue S.W.
Room 5309
Washington, D.C. 20201
(202) 305-3564

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
      and Human Services

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ST. MICHAEL'S MEDICAL CENTER, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-1484 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary, | ) | **ECF** |
| U.S. Department of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The Defendant Secretary of Health and Human Services (the Secretary) moves for summary judgment in this case because he acted within the statutory authority Congress delegated to him to calculate the so-called wage index component of the payment rate used to reimburse Plaintiffs for their operating costs of furnishing inpatient services to Medicare beneficiaries in federal fiscal years (FY) 2000 and 2001. Reimbursements to Medicare provider hospitals, like Plaintiffs, depend in part on the average wage level in their geographic areas, as calculated by the Secretary. Congress enacted special provisions for Medicare provider hospitals that incur significantly higher costs than their neighbors because they compete for skilled labor with hospitals outside their geographic area. For reimbursement purposes, these higher cost hospitals may be treated as if they are in a different area, or "reclassified" to that area. For urban areas, Congress did not specify how the Secretary was to consider the potential effect of such

reclassifications on the other hospitals in the area that had not been reclassified. From 1991 to 2001, the Secretary exercised his discretion to exclude the higher cost reclassified urban hospitals' wage data from the data used to calculate the area average wage index for the areas from which they had been reclassified. Beginning in FY 2002, after ten years of experience administering the geographic reclassification program, the Secretary exercised his discretion to revise his policy to include this data in the area average wage index. Under the deferential Administrative Procedure Act standard of review applicable to this case, the Court should defer to both policies as proper exercises of the Secretary's discretion, and grant the Secretary's motion for summary judgment.

STATUTORY AND REGULATORY BACKGROUND

I.    MEDICARE PART A

The Medicare program, established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 to 1395hhh, pays for covered medical care furnished primarily to eligible aged or disabled persons. This case concerns Part A of the program, which authorizes payment for covered institutional care, including hospitals. The Secretary administers the Medicare program through the Centers for Medicare and Medicaid Services (CMS), which was known as the Health Care Financing Administration (HCFA) during most of the events in this case.

Hospitals that wish to participate in Medicare Part A enter into agreements with the Secretary under which the Secretary reimburses the providers for providing covered services to eligible Medicare beneficiaries. 42 U.S.C. § 1395cc. Most hospitals that have entered into such agreements, including the Plaintiffs, are reimbursed under the Prospective Payment System (PPS). PPS is designed to contain costs and promote efficiency among providers by setting an

2

amount that Medicare will pay providers for treating eligible beneficiaries with different categories of diseases or injuries.  Under PPS, the Secretary pays hospitals a fixed amount for each patient the hospital discharges regardless of the actual costs the hospital incurs treating the patient.

II.     CALCULATING PAYMENT UNDER PPS USING THE WAGE INDEX

The Medicare Act requires a complex series of calculations to determine the amount a hospital will be reimbursed for any given service.  The Secretary sets national rates for specific categories of treatments, called diagnostic-related groups (DRGs), which are intended to represent the cost of efficient treatment of the particular diseases or injuries.  To determine these national rates, the Secretary first developed base period cost data reflecting Medicare-allowable hospital costs for each participating hospital's most recent reporting period for which data were available.  42 U.S.C. § 1395ww(d)(2)(A); 42 C.F.R. § 412.62(b).  Using these data, the Secretary then calculated the average actual Medicare-allowable costs per discharge during the base period for each participating hospital.  Medicare Program; Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,763-64 (Sept. 1, 1983).  This average of allowable costs per Medicare discharge is periodically updated for inflation.  *Id.* at 39,764; 42 C.F.R. § 412.64(d).

The Act requires that the updated average cost per Medicare discharge be "standardized" by removing the effects of various factors on hospitals' average costs per discharge.  42 U.S.C. § 1395ww(d)(2)(C).  These factors include the indirect costs associated with graduate medical education programs, "case mix" (the relative complexity and costliness of each hospital's cases), and local variations in hospital wage levels.  *Id.*

3

The amount the hospital is paid per discharge under PPS varies in part based on its location.  Just as the Medicare Act requires that wage cost variations be removed to create a national standardized amount, the Act also requires that the portion of that national standardized amount attributable to labor costs be adjusted to take account of hospital wage levels in the hospital's particular area.  Specifically, 42 U.S.C. § 1395ww(d)(3)(E)(i) provides in pertinent part:

> [T]he Secretary shall adjust the proportion . . . of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level.

The "factor" is known as the "wage index."  The wage index is a comparison of the average hospital hourly wage in an area with the national average hospital hourly wage. Proposed Schedule of Limits on Hospital Inpatient General Routine Operating Costs, 44 Fed. Reg. 11,612, 11,613 (1979).  An index greater than 1.0 indicates that the hospital is located in an area where the wages are higher than the national average, while an index less than 1.0 indicates that the hospital is located in an area where the wages are below the national average.  The Secretary multiplies the "labor-related portion" of the standardized amount by the wage index for the geographic area in which the hospital is located.  48 Fed. Reg. 39,765.  The sum of the wage adjusted labor-related share and the non-labor related share of the standardized amount is then multiplied by the DRG relative weight, which represents the relative amount of resources required to treat that diagnostic group, to result in the amount the hospital will be reimbursed for a particular service.  42 C.F.R. § 412.63(w).

Thus, a hospital's reimbursement will vary considerably depending on the relative

4

hospital wage level in its area.  The Secretary uses Metropolitan Statistical Areas (MSAs), as defined by the Office of Management and Budget, as the areas for the wage index adjustment. MSAs represent a core urban area and surrounding counties in which more than 25% of workers commute into the core area.  All counties in a state which are not part of a MSA make up that state's rural area.  42 C.F.R. §§ 412.63(b)(1), 412.62(f)(iii).

III.    GEOGRAPHIC RECLASSIFICATION

Shortly after enacting PPS, Congress recognized that this system created inequities for rural hospitals who competed with nearby urban hospitals for their employees.  These hospitals claimed that they were not adequately reimbursed by the wage index for their areas because they had to pay well above the area average wage level.  To address this problem, Congress revised the statute to provide that the Secretary should treat certain hospitals located in rural counties as if they were located in nearby urban counties if a significant proportion of the residents of the rural county commuted to the urban area and the hospital's wage index was at least 85% of that of the urban area.  Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4005, *codified as* 42 U.S.C. § 1395ww(d)(8)(B)(i).

In 1989, Congress expanded the reclassification provisions to include urban hospitals that wished to reclassify as rural, or to another urban area.  It established the Medicare Geographic Classification Review Board to review applications by hospitals paid under PPS requesting that the Secretary change their geographic classification for purposes of the wage index.  Omnibus Reconciliation Act of 1989, Pub. L. No. 101-239, § 6003, *codified as* 42 U.S.C. § 1395(d)(10). Congress also required that the Secretary publish guidelines to be used by the Board in making reclassification decisions.  *Id.* at (d)(10)(D)(i).  These guidelines are found at 42 C.F.R. §§

412.230-412.235.  Under the Secretary's regulations, a single urban hospital seeking

reclassification for FY 2000 and 2001 must have demonstrated that it was geographically

proximate to the new area, or that at least 50 percent of its employees resided there, and that the

hospital's average hourly wage was at least 108 percent of average hourly wages of all hospitals

in the original area and at least 84 percent of those in the new area.  42 C.F.R. § 412.230(b)(1),

(2); (d)(iii)(A), (iv)(B).  Hospitals that successfully reclassified would receive reimbursement as

if they were located in the new area.

From the outset, Congress recognized that reclassifications might reduce the wage index

– and reimbursements – for hospitals located in both the original area and the new area.  To

protect hospitals located in an urban area into which other hospitals have reclassified, section

1395ww(d)(8)(C)(i)(I) provides that the wage index data for the incoming reclassified hospitals

must be excluded from the calculation of that area's wage index if those hospitals' data reduces

the new area's wage index by less than 1%.  If the incoming hospitals' data reduces the new

area's wage index by more than 1% , then it may only be used to calculate the wage index for the

reclassified hospitals.  *Id.* at (d)(8)(C)(i)(II).  The hospitals located in the new area would use a

wage index that did not include data from incoming hospitals.  *Id.*  For example, suppose an area

has four hospitals, with wage levels of $98, $99, $101, and $102, with an area average of $100.

If a rural hospital successfully reclassified with a wage level of $84, it would reduce the area

average to $96.80.  This reduction is greater than 1%.  Thus, for wage index purposes, the

original four hospitals would still have an area average wage level of $100, while the new

hospital would use $96.80.  Comparing these different average wage levels to the national

average wage would result in two area wage indexes: a higher wage index to be used by the

6

hospitals actually located in the new area and a lower wage index to be used by the hospitals reclassifying into that area.

Congress also made special provisions for rural areas. Section 1395ww(d)(8)(C)(ii) provides that if the reclassification of a hospital from a rural to an urban area reduces the rural area's wage index, then the Secretary must calculate the rural area's wage index as if the reclassification did not take place. In this example, suppose the rural area had five hospitals, with average wages of $48, $49, $51, $52, and $84, resulting in a rural average of $56.80. After the fifth hospital reclassified to an urban area, the rural average would not decrease to $50, but would remain $56.80. The other four rural hospitals thus would be "held harmless" from the effects of the reclassification of their high wage neighbor. Importantly, Congress did not make a comparable "hold harmless" provision for urban areas. However, it did specify later that the reclassification of a hospital may not reduce the wage index of any county, rural or urban, below that of the rural areas in the State. 42 U.S.C. § 1395ww(d)(8)(C)(iii).

Finally, Congress provided that the net effect of these reclassifications was to be budget neutral, and that the Secretary would achieve budget neutrality by adjusting the national standardized amounts. 42 U.S.C. § 1395ww(d)(8)(D). According to the Conference Report, "[t]he Secretary is required to adjust the payment rates, *for urban hospitals only*, to assure that any reclassification of hospitals from rural to urban is budget neutral." House Conf. Rep. No. 100-495 at 532, *as reprinted in* 1987 U.S.C.C.A.N. 2313-1245 at 2313-1278 (emphasis added).

IV.    THE SECRETARY'S CONSIDERATION OF THE EFFECT OF RECLASSIFICATION
       ON URBAN WAGE INDEXES

       In 1991, the Secretary considered how to calculate the wage index for urban areas, given

the expansion of the reclassification provisions.  Medicare Program; Changes to the Inpatient

Hospital Prospective Payment System and Fiscal Year 1992 Rates, 56 Fed. Reg. 43196, 431221

(Aug. 30, 1991).  Many commenters had expressed concern that wage index levels in urban areas

would be reduced when high wage hospitals reclassified from those areas to higher cost areas.

These commenters suggested that the Secretary apply the same protection to urban areas as the

Act provides for rural areas.  *Id.*  For example, suppose an urban area has five hospitals, with

wage levels of $98, $99, $101, $102, and $111, resulting in an area average of $102.20.  This

area average underpays the last hospital, but overcompensates the first four.  If the last hospital

reclassifies to a higher cost area (because its wage level was more than 108% of the area

average), the area average then drops to $100.  Under the "hold harmless" rule proposed by the

commenters, the area average would remain $102.20, which would continue to overpay the first

four hospitals while the last hospital received the benefit of the higher wage index in its new

area.

       Nevertheless, the Secretary decided against applying a "hold harmless" rule to urban

areas at that time because "[t]he statute is very specific with respect to the treatment of the wage

index values for geographic areas from which and to which hospitals have been reclassified."  *Id.*

The Secretary was also concerned that holding urban areas harmless would require further

reductions to the urban standardized amount below those already required to maintain budget

neutrality.  *Id.*  In other words, the Secretary would be required to lower the national standard

amount used for urban hospitals even before the wage index was applied.  The effect of such a

rule would be to reduce reimbursements to all urban hospitals to benefit a few.[1]  The Secretary

was thus reluctant to make such a "significant change in the scheme constructed by Congress."

*Id.*

The following year, commenters again raised the issue of the effect of reclassification on

urban areas, but in a slightly different context.  Medicare Program: Changes to the Hospital

Inpatient Prospective Payment Systems and Fiscal Year 1993 Rates, 57 Fed. Reg. 39746, 39764-

65 (Sept. 1, 1992).  First, several commenters asked for a "hold harmless" provision for urban

areas where the effect of reclassifications lowered an urban area's wage index below the

statewide average rural wage index (also known as the "rural floor").  They requested that the

Secretary either use the "rural floor" wage index in such areas or that the Secretary include the

data from reclassified hospitals in the wage index, similar to the rural "hold harmless" provision.

*Id.*  Second, other commenters noted that in several urban areas, all of the hospitals had received

reclassifications, leaving the area "empty."  *Id.* at 39765.  These commenters also requested that

the Secretary compute the wage index using the data from the reclassified hospitals should a new

hospital choose to open in the area.  *Id.*

In response, the Secretary again was reluctant to deviate from express congressional

intent:

> The law is very specific concerning how the wage index values should be
> calculated as a result of hospital reclassifications.  Congress clearly contemplated
> that reclassified hospitals would not be considered part of their original labor
> market areas for purposes of computing the wage indexes for those areas.  This is
> evidenced by section 1886(d)(8)(C) of the Act [42 U.S.C. § 1395ww(d)(8)(C)],
> which provides an exception to this requirement for those rural areas where

---

[1]  Separate rural and urban standardized amounts were eliminated in FY 1995.  *See* 42
U.S.C. § 1395ww(d)(3)(A)(iii).

reclassification of hospitals from those areas would reduce the rural wage index value. Accordingly, we believe the statute is clear that the wage index for each area would be computed exclusive of the data for the hospitals that have been granted reclassification from those areas.

57 Fed. Reg. at 39765. For urban areas, the Secretary continued to remove the wage data of the reclassified hospitals from the wage indexes of their original areas and to use it instead for the wage indexes for their new areas, subject to certain statutory limitations. With slight modifications for "empty" urban areas,[2] this policy continued in effect in both FY 2000 and FY 2001. *See* Medicare Program: Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47054, 47077 (Aug. 1, 2000) ("except for those rural areas in which redesignation would reduce the rural wage index value, the wage index value for each area is computed exclusive of the wage data for hospitals that have been redesignated for the area for purposes of their wage index").

In March 2001, the Medicare Payment Advisory Commission (MedPAC) issued a report to Congress recommending that Congress consider amending the Act to require the Secretary to include data from reclassified hospitals when calculating the wage index for urban areas. Medicare Payment Advisory Commission, *Report to Congress: Medicare Payment Policy* 82 (March 2001), http://www.medpac.gov/documents/Mar01%20Entire%20report.pdf (hereinafter MedPac Report). MedPAC noted that reclassification was really intended for rural hospitals bordering urban areas, but that urban hospitals could also apply, and that 83 urban hospitals had

---

[2] In 1995, the Secretary decided to use data from reclassified hospitals to calculate the wage index for empty urban MSAs, reasoning that if a new hospital were to open in the area, the data from reclassified hospitals would be a better predictor of wage rates than the statewide rural average wage rate. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1996 Rates, 60 Fed. Reg. 45778, 45799 (Sept. 1, 1995).

10

been reclassified in FY 2000. *Id.* While the statute protects urban hospitals from the dampening effect of incoming rural reclassified hospitals, some urban hospitals lost more from outgoing reclassifications of urban hospitals from their areas. *Id.* MedPAC pointed out that the potential reduction in some urban areas' wage indices had led the hospitals in those areas to organize and pay qualifying hospitals not to reclassify to another area. *Id.* Including the reclassified data in the wage index would be more accurate, MedPAC reasoned, because the reclassified hospitals competed for workers both with the hospitals in the higher cost areas to which they had been reclassified, but also with the hospitals in their original areas. *Id.* MedPAC recommended that Congress make the change because while "HCFA appears to have the authority to make this change though regulation," it had been "reluctant to make the change itself" since Congress had legislated protection for rural hospitals but not urban ones. *Id.* at 83.

In the proposed rule setting forth PPS payment rates for FY 2002, the Secretary agreed that his policy may have created "distorted incentives," and proposed to include data from reclassified hospitals in the wage indexes of urban areas starting in FY 2002. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2002 Rates, 66 Fed. Reg. 22646, 22678 (proposed May 4, 2001). The Secretary believed that this policy change would improve consistency and predictability in wage indexes, because hospitals applying to reclassify into another area would know that all the hospitals physically located in the area would be included in calculating the wage index. *Id.* The Secretary also noted that in some cases, excluding the data of hospitals that had been reclassified to another area could have a large downward impact on the wage index of the area in which the hospital is physically located, which could lead to large wage disparities between the reclassified hospitals and the

11

other hospitals remaining in the area.  *Id.*  The change would also simplify the rules with respect to how rural wage indexes are calculated.  *Id.*  The proposed rule was adopted in August 2001. Medicare Program; Changes to the Hospital Inpatient Prospect Payment Systems and Rates, 66 Fed. Reg. 39828, 39865 (Aug. 1, 2001).  It remains in effect to this day.

V.      THE ADMINISTRATIVE APPEALS PROCESS

The Medicare statute establishes the review mechanisms available to Medicare providers of services, including hospitals, for reimbursements under Medicare Part A.  42 U.S.C. § 1395oo. During the time period of this case, a Medicare Part A provider, like the Plaintiffs, would submit an annual report with all the costs for which it claims reimbursement to a Medicare "fiscal intermediary," which is a private entity acting as the Secretary's agent.  42 U.S.C. § 1395h (1999); 42 C.F.R. § 405.1801(b)(1).  The intermediary reviews the cost report and determines in a notice of program reimbursement how much reimbursement actually is due the provider for that cost year.

A provider, or, as in this case, a group of providers that is dissatisfied with a Medicare reimbursement decision of their fiscal intermediaries may appeal to the Provider Review Reimbursement Board (PRRB), an administrative tribunal within HHS that Congress established to hear Medicare reimbursement disputes.  42 U.S.C. § 1395oo(a), (b).  If jurisdictional prerequisites are satisfied and the Board has the authority to decide the matter at issue, the Board may hold a hearing and issue a decision.  *Id.*  If the PRRB lacks authority to decide the question at issue (such as a facial challenge to the validity of a regulation or a provision of the statute), the PRRB may grant expedited judicial review (EJR), which allows the provider to bring its challenge directly in federal court.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

12

A decision of the PRRB is final unless the Secretary, on his own motion, reverses, affirms or modifies the Board's decision. *See* 42 U.S.C. § 1395oo(f)(1). The Secretary has delegated his authority to review PRRB decisions to the Administrator of CMS. 42 C.F.R. § 405.1875(a)(1). A provider dissatisfied with a decision of the PRRB or the Secretary (if the Secretary reviews the Board's decision) may seek judicial review of that decision by filing a civil action within 60 days of the date that notice of the final decision is received. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

## FACTS

Plaintiffs are twenty two urban hospitals located in multiple Metropolitan Statistical Areas (MSAs) in New Jersey, New York, and Connecticut. Complaint ¶ 3; Complaint, Civil No. 07-2036, ¶ 4. They are located in urban areas from which at least one hospital has reclassified to another area. Complaint ¶¶ 15, 20; Complaint, Civil No. 07-2036 ¶¶ 15, 20. Plaintiffs submitted cost reports requesting reimbursement for FY 2000 and FY 2001 to their fiscal intermediaries, Complaint ¶¶ 15, 20 (FY 2001), Complaint, Civil No. 07-2026, ¶¶ 15, 20 (FY 2000), but were dissatisfied with the amounts they received because they believed the wage index had been reduced improperly by removing data from reclassified hospitals. Complaint ¶¶ 15, 20; Complaint, Civil No. 07-2036, ¶¶ 15, 20. They appealed to the PRRB, and asked that their wage index claims be consolidated into group appeals for FY 2000 and FY 2001. Complaint ¶ 15, Complaint, Civil No. 07-2036, ¶ 15.

On July 16, 2007, the PRRB determined that the FY 2001 case was appropriate for EJR because it constituted a challenge to an agency rule. Administrative Record (A.R.) at 2. Plaintiffs filed civil action number 07-1484 in this Court on August 17, 2007. On November 5,

2007, the PRRB determined that the FY 2000 case also was appropriate for EJR, Complaint, Civil No. 07-2036 at ¶ 15, and Plaintiffs filed that case in this Court on November 9, 2007. On January 4, 2008, the Court consolidated the two actions at the parties' request.

## ARGUMENT

I.     STANDARD AND SCOPE OF REVIEW

### A.     The narrow APA standard applies to review of the Secretary's calculation of the wage index

The Court's consideration of whether the Secretary has properly exercised his discretion to calculate the wage index falls under the Administrative Procedure Act (APA) standard as incorporated by the Medicare Act. 42 U.S.C. § 1395oo(f)(1). The APA provides that agency actions, findings, and conclusions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-15 (1971).

Courts have consistently held that the APA standard of review is narrow. Under the arbitrary and capricious standard, an agency action may be invalidated only if it is "not rational and based on consideration of the relevant factors." *FCC v. Nat'l Citizens Comm. for Broadcasting*, 436 U.S. 775, 803 (1978). *See also Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious if the agency relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise).

14

Given the narrowness of the APA standard of review, a reviewing court may not substitute its judgment for that of the agency. Instead, under *Chevron*, the court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984). If Congress has not directly spoken to the issue, the court must defer to a "permissible" construction of the statute by the agency. *Id.* at 843.

Congress has "conferred on the Secretary exceptionally broad authority to prescribe the standards for applying certain sections of the [Medicare statute.]" *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 418 n.13 (1993). The D.C. Circuit has recognized that the wage index provision at issue in this case is one of these sections. *See Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1229-30 (D.C. Cir. 1994) ("The statute does not specify how the Secretary should construct the [wage] index . . . . Rather, Congress through its silence has delegated these decisions to the Secretary.") Accordingly, the Secretary's interpretation of the wage index provision should be given deference in this case.

**B.    Summary judgment is proper because the Secretary is entitled to judgment as a matter of law**

Plaintiffs' challenge to the calculation of the FY 2000 and 2001 wage index may properly be resolved on a motion for summary judgment. Summary judgment is warranted where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994) (applying summary judgment standard). In this case, there is no genuine issue of fact. To the contrary, the parties do not dispute the relevant facts, which are contained in the administrative record. Since

15

the Secretary's actions were well within his broad statutory authority to implement the wage

index, he is entitled to judgment as a matter of law.

II.    THE SECRETARY'S DECISION TO EXCLUDE WAGE DATA FROM
       RECLASSIFIED HOSPITALS WAS CONSISTENT WITH THE STATUTE

        The Secretary's policy from FY 1992 through FY 2001 was a permissible reading of the

statute and should not be disturbed by this Court.  Congress did not prescribe how the Secretary

should treat wage data from hospitals that have been reclassified to a different area in calculating

the wage index.  The statutory wage index provision grants the Secretary broad authority to

adjust labor related costs for "area differences in hospital wages levels" by a "factor," to be

"established by the Secretary," that "reflect[s]" the "relative hospital wage level in the

geographic area of the hospital" compared to the national average hospital wage level.

42 U.S.C. § 1395ww(d)(3)(E)(i).  From FY 1992, when the Secretary first implemented the

reclassification provisions, until FY 2001, the Secretary calculated urban wage indexes without

including wage data from hospitals that had reclassified to other areas.  This decision was within

the authority granted by subsection (d)(3)(E)(i) when it is read in context with the

reclassification provisions at subsections (d)(8) and (d)(10).

        When Congress enacted the reclassification provisions, it expressly recognized that some

hospitals are so different from the other hospitals in their immediate surroundings that they

should not be reimbursed as if they were in the same area.  *See* 42 U.S.C. § 1395ww(d)(8)(B)(i)

(rural counties reclassified where a majority of workers commute to an urban center);

§ 1395ww(d)(10)(D)(i) (describing criteria for reclassification by MGCRB).  *See also Athens*

*Community Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1180 (the purpose of reclassification is "sorting

out the labor markets in which a hospital competes"); *Robert Wood Johnson Univ. Hosp. v.*

16

*Thompson*, 297 F.3d 273, 285 (3d Cir. 2002) ("the purpose of reclassification . . . is to provide comparable reimbursement to hospitals that compete for the same labor pool due to their geographic proximity"). Thus, it was reasonable for the Secretary to read the statute as allowing him to remove data from hospitals that really belong in another area when calculating the wage index.

Far from precluding the Secretary's reading of the statute, Congress anticipated it and acted to mitigate many of its consequences. First, Congress enacted a series of protections for rural areas from which hospitals were reclassifying to urban areas, 42 U.S.C. § 1395ww(d)(8)(C)(ii), and for urban areas into which hospitals were reclassifying from other areas. 42 U.S.C. § 1395ww(d)(8)(C)(i). In 1993, Congress returned to reclassifications and the wage index to provide that reclassification should not cause the wage index for an urban area to fall below that of rural areas in the state (known as the "rural floor"). Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66 §13501(b) (1993), *codified as* 42 USC § 1395ww(d)(8)(C)(iii) and (iv). In 1997, Congress also provided that an urban wage index may not be less than the rural wage index for the state. Balance Budget Act of 1997, Publ. L. 105-33 § 4410, 111 Stat. 251, 402. Notably, however, Congress never disturbed the Secretary's policy choice to exclude data from reclassified hospitals from urban wage indexes. It was certainly not unlawful for the Secretary to decline to extend "hold harmless" protection to urban hospitals prior to FY 2002. Clearly, the statute required no such protection. *See* 42 U.S.C. § 1395ww(d)(3)(E)(i).

Plaintiffs contend that the plain language of section 1395ww(d)(3)(E)(i) requires that the area wage index include data from every hospital geographically located in the same area. (Pl.

17

Mem. at 3).  However, if Plaintiffs were correct, then Congress need not have enacted either the

rural "hold harmless" provision or the "rural floor," because the Secretary already would have

been required to include wage data from reclassified hospitals in their original areas.  The

general rule would swallow the statutory exceptions.  Thus, Plaintiffs' argument cannot be

correct.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole,

to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous,

void, or insignificant."  *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks

omitted).

Instead, the Secretary's policy should be given deference because it properly considered

the purpose of geographic reclassification.  In providing for geographic reclassification,

Congress recognized that some hospitals do not compete in the same labor market as their

neighbors and should be treated differently than their neighbors for purposes of the wage index.

Thus, it was not arbitrary and capricious of the Secretary to take this distinction into

consideration when calculating the wage index.  The Secretary's policy sought to give effect to

this distinction by adopting the general rule that data from reclassified hospitals should be used

in their new areas, and not the old ones, except where Congress specifically provided otherwise.

*See* 56 Fed. Reg. at 431221; 57 Fed. Reg. 39764-65 (declining to adopt an urban "hold harmless"

provision because Congress had only provided one for rural areas).

Plaintiffs cite a series of cases, some of which do not involve the wage index, and none of

which supports their argument.  The first, *Georgetown University Hospital v. Bowen*, 862 F.2d

323 (D.C. Cir. 1988), did not concern the wage index at all but a different provision of the statute

that used hospital-specific costs in the first years of PPS.  *See Methodist Hospital of Sacramento*

18

*v. Shalala*, 38 F.3d 1225, 1231 (D.C. Cir. 1994) (explaining limitations of *Georgetown University Hospital* holding). The hospital specific portion was a transitional payment amount that was phased out in 1988. 42 U.S.C. 1395ww(d)(1)(A)(iii). It does not apply to the calculation of the wage index in FY 2000 or 2001. Moreover, at the same time that the D.C. Circuit held that *Georgetown University Hospital* does not apply to the wage index, it also recognized that subsection (d)(3)(E)(i) "merely requires the Secretary to develop a mechanism to remove the effects of local wage differences . . . [but] does not specify how the Secretary should construct the index." *Methodist Hospital*, 38 F.3d at 1230. The D.C. Circuit thus recognized that Congress left the fashioning of the wage index to the Secretary.

Similarly, the *Bellevue* and *Anna Jacques* decisions are beside the point because they concern how the Secretary collects data at the outset for the wage index, and not how the Secretary considers reclassifications when calculating the area averages at the end of the process. In *Bellevue*, the court reviewed language Congress added to section 1395ww(d)(3)(E)(i) in 2000 requiring the Secretary to collect data on the occupational mix of employees of PPS hospitals. *Bellevue Hospital Center v. Leavitt*, 443 F.3d 163, 172 (2d Cir. 2006). In uncodified language, Congress required the Secretary to complete data collection on hospitals' occupation mix and measurement of earnings and paid hours of employment by occupational category "[b]y not later than September 30, 2003, for application beginning October 1, 2004." Pub. L. No. 106-554, § 304(c)(3). The *Bellevue* court read this uncodified language as unambiguously requiring the Secretary to complete the data collection and apply the occupational mix. *Bellevue*, 443 F.3d at 178-79. Since its holding is premised on different statutory language than is at issue in this case, the *Bellevue* decision cannot be read as limiting the Secretary's discretion to exclude data from

19

reclassified hospitals from the area average for the wage index.  In fact, when the Second Circuit considered the language at issue in this case, it held that the Secretary has "broad discretion" to determine the size and shape of a "geographic area."  *Id.* at 175.

The court again was considering wage survey data in *Anna Jacques Hospital v. Leavitt*, 537 F. Supp.2d 24 (D.D.C. 2008).  In that case, several urban providers challenged the calculation of the "rural floor" wage index for the state of Massachusetts for FY 2005.  *Id.* at 28.  The Secretary had excluded wage data from the only rural hospital in Massachusetts from the "rural floor" calculation because that hospital had subsequently converted to a different provider status and therefore no longer was paid under PPS.  *Id.*  The court ruled that the Secretary had erred because the second sentence of section 1395ww (d)(3)(E)(i) required the Secretary to use data from all PPS hospitals in calculating the wage index.  *Id.* at 31.

While the Secretary respectfully disagrees with the court's decision and has requested reconsideration, *Anna Jacques* should have no bearing on this case.  First, unlike the Plaintiffs in this case, the urban hospitals in *Anna Jacques* did not challenge the calculation of their own wage index.  They instead sought to increase the "rural floor" which comes into play only after the Secretary has calculated an urban wage index.  42 U.S.C. § 1395ww(d)(8)(iv).  Second, in *Anna Jacques*, the Secretary did not use the excluded data in the wage index at all.  Here, the issue is not whether the reclassified hospitals' data was used to compute an area wage index, but whether it should be used twice: once in the new area under section 1395ww(d)(8)(C)(i) and again in the old area as requested by Plaintiffs.  The court held that the Secretary could not "cherry pick" categories of hospitals not to include in the wage index.  *Anna Jacques*, 537 F. Supp. 2d at 33.  However, the reclassified hospitals in this case were not "cherry picked," but

20

identified as a result of the statutory reclassification process under 42 U.S.C. § 1395ww(d)(10). This case is not a case like *Anna Jacques* where the Secretary has decided to exclude the one hospital's data completely from the wage index calculation because that hospital no longer was paid under PPS. Rather, it is a case in which the Secretary must decide how best to use the data of hospitals that are unquestionably PPS hospitals that have been adjudicated to compete with hospitals in a nearby area.

Moreover, while Congress did provide more specificity in 1987 about when and how the Secretary was to survey hospitals for wage data, *Anna Jacques*, 537 F. Supp. 2d at 32, Congress did not thereby enact an urban "hold harmless" provision, or require the Secretary to promulgate one. As discussed above, Congress added provisions to the statute in 1989 and 1993 that presumed the Secretary would use data from reclassified hospitals to calculate the wage index in their new areas, and would remove it from the wage index for their old areas.

Plaintiff's case also is not helped by *Centra Health Inc. v. Shalala*, 102 F. Supp. 2d 654 (W.D. Va. 2000). In that case, the plaintiff hospitals were arguing for the exclusion of the wage data collected from a state facility that, they argued, was not comparable because it primarily functioned as a long term care facility, and thus lowered the area wage index due to its larger number of unskilled employees. 102 F. Supp. at 657. The court held that the state facility's data must be excluded from the area wage index, *id.* at 660, and noted that "[t]he Secretary has consistently removed from wage index calculation those hospitals that, for some reason or another, inappropriately skew it." *Id.* at 659. This holding, which appears to be in tension with the holding in *Anna Jacques*, has no bearing on the question presented here regarding whether the Secretary was compelled to promulgate a "hold harmless" policy for urban areas. Instead, to

21

the extent that this case is relevant, it supports the Secretary's position that he could exclude wage data from reclassified hospitals because they skew the wage index.

Finally, the Secretary's policy also does not conflict with the Third Circuit's decision in *Robert Wood Johnson University Hospital v. Thompson*, 297 F.3d 273 (3d Cir. 2002). In that case, the hospital sought reclassification to the New York City MSA. *Robert Wood Johnson Univ. Hosp.*, 297 F.3d at 279. To do so, its wages needed to be at least 84% of the area average for the New York City MSA. *Id.* at 276. To determine whether a hospital meets this 84% threshold, the Secretary does not include data from hospitals that themselves have reclassified into the area. The court ruled that this "reclassification exclusion" was a pragmatic rule that "ensures that the practice of reclassification does not create anomalous results." *Id.* at 285. The court explained that since reclassification lasts only a limited period of time, including wage data from reclassified hospitals in the area average could result in the Secretary comparing the applicant hospital's data with an average that contains its own data, which would be an anomalous result. *Id.* The court further reasoned that the "reclassification exclusion" served the purpose of the reclassification provisions because it prevented the plaintiff hospital from being compared with other reclassified hospitals that, while they might also compete with the New York City hospitals, do not compete directly with the Plaintiff. *Id.*

The same focus on the underlying purpose of reclassification should guide the inquiry here. When calculating a wage index factor to reflect the relative wage level for those urban hospitals that compete with each other, the statute permits the Secretary to remove the data from those hospitals that he judges compete with a different, higher cost area. As in *Robert Wood Johnson*, the Secretary's decision was a valid exercise of his discretion, and the Court should

22

defer to it.

III.    WHERE THE STATUTE IS SILENT, THE SECRETARY MAY CHANGE POLICIES
       WITHOUT INVALIDATING THE FORMER POLICY

In 2001, the Secretary proposed to change his policy to include wage data from

reclassified hospitals in urban wage indexes.  It is well established that an agency may depart

from prior policy provided the departure is explicitly and rationally explained.  *Atchison, Topeka*

*& Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 808 (1973) (plurality

opinion).  The Secretary is allowed, indeed is required, to modify his existing policies through

either their repeal or amendment as part of the regulatory process in light of actual experience

and new information gained through the administration of the program.  *ILGWU v. Donovan*,

722 F.2d 795, 814 n.33 (D.C. Cir. 1983).  As the Supreme Court explained in its seminal

decision in *Chevron*:

> [a]n initial agency interpretation is not instantly carved in stone. On the contrary,
> the agency, to engage in informed rulemaking, must consider varying
> interpretations and the wisdom of its policy on a continuing basis.  Moreover, the
> fact that the agency has adopted different definitions in different contexts adds
> force to the argument that the definition itself is flexible, particularly since
> Congress has never indicated any disapproval of a flexible reading of the statute.

*Chevron*, 467 U.S. at 863-64.  *See Smiley v. Citibank (South Dakota) N.A.,* 517 U.S. 735, 742

("Of course, the mere fact that an agency interpretation contradicts a prior agency position is not

fatal. . . . [C]hange is not invalidating, since the whole point of *Chevron* is to leave the discretion

provided by the ambiguities of a statute with the implementing agency.") (citations omitted).

*See also Motor Vehicle Mfrs. Assn. of United States, Inc.*, 463 U.S. at 42 ( while administrative

agencies must be given ample latitude to adapt their rules and policies to the demands of

changing circumstances "there is no more reason to presume that changing circumstances require

23

the rescission of prior action, instead of a revision in or even the extension of current

regulation").

In this case, the Secretary considered the recommendations of the MedPAC study, as well

as the comments on the proposed rule, and decided to adopt an urban "hold harmless" rule, in

light of ten years' experience with wage indexes combined with reclassifications.  66 Fed. Reg.

at 39865.  Contrary to Plaintiffs' assertions, the Secretary did not "see the error of his ways" (Pl.

Br. at 13), but evaluated ten years of experience and decided to change the policy.  Based on this

experience, the Secretary determined that while hospitals are reclassified because they compete

with hospitals in higher cost areas for employees, those hospitals also continue to compete with

the other hospitals in their original areas.  66 Fed. Reg. at 39866.  The higher wages offered by

the reclassified hospitals would create upward pressure on the wages offered by the neighboring

hospitals.  Thus, the Secretary decided that including their data in the wage index for both areas

would better reflect their true labor costs.  *Id.*

Plaintiffs assert that the Secretary somehow admitted that the current policy was the only

correct one by using the word "continue" in the notice of final rule making.  (Pl. Mem. at 17-18.)

This argument takes the word "continue" out of context.  The rule making notice states that

reclassified hospitals "continue to compete with the hospitals that are grouped with them in their

respective MSAs."  66 Fed. Reg. at 39866.  Contrary to Plaintiffs' assertions, the use of the word

"continue" in the above sentence does not refer to competition between hospitals both before and

after the Secretary's 2001 decision to revise his policy.  Instead, it is merely a statement that

reclassified hospitals tend to compete with the other hospitals in their geographic area both

before and after reclassification.  The next sentence confirms this reading.  "Therefore, it would

24

be appropriate to *continue* to calculate the wage index for those areas *as if those hospitals had not reclassified to another area*." *Id.* (Emphasis added.) The following sentence also makes clear that Plaintiffs' reading of the word "continue" cannot be correct:

> As a result, we intend to implement our policy to hold urban hospitals harmless to the extent that the wages of the hospitals that are physically located within urban areas *will continue to be used* in the compilation of the wage index whether or not these hospitals successfully seek reclassification elsewhere.

*Id.* (emphasis added). It is uncontested that before the policy change, the Secretary did not use—and did not intend to use—the data from reclassified hospitals to calculate the wage index in their original areas. Thus, it is hard to see how this sentence could use the word "continue" as referring to either the actual or intended use of data from the reclassified hospitals before the 2001 policy change.

The Court should instead consider that during the ten years the old policy was in effect, Congress declined to interfere with it. When MedPAC recommended the adoption of an urban "hold harmless" rule, it suggested that Congress adopt it by statute, because the Secretary had been reluctant to do so by regulation. MedPAC Report at 83. The Secretary instead proposed the new policy within months of the publication of the MedPAC report, 66 Fed. Reg. at 22678, and Congress took no action on either the old or the new policy. Therefore, the Court should defer to both the old policy as well as the new policy as valid exercises of the Secretary's discretion.

IV.     THE SECRETARY'S CHANGE OF POLICY DOES NOT VIOLATE EQUAL PROTECTION

Neither the Secretary's old nor new wage index policy offends the equal protection guarantee found in the due process clause of the Fifth Amendment of the U.S. Constitution.

25

Courts review equal protection challenges to social and economic regulations under the Social

Security Act using a very deferential standard. A statute or regulation will be struck down only

if it "manifests a patently arbitrary classification, utterly lacking in rational justification."

*Weinberger v. Salfi*, 422 U.S. 749, 768 (1975). *See Clinton Memorial Hosp. v. Sullivan*, 783 F.

Supp. 1429, 1440 (D.D.C. 1992), *aff'd, Clinton Memorial Hosp. v. Shalala*, 10 F.3d 854, 860-61

(D.C. Cir. 1993) (applying rational basis standard to Medicare regulations). *See also Ambach v.*

*Bell*, 686 F.2d 974, 980 n.2 (D.C. Cir. 1982) (An equal protection claim alleged in the context of

economic regulations is most likely weaker, and certainly no stronger, than claims based on the

"arbitrary and capricious" standard").

  Here, Plaintiffs appear to raise two challenges. They claim that the Secretary arbitrarily

distinguished between rural areas and urban areas in his pre-2002 policy. (Pl. Mem. at 22).

They also contend that when the Secretary issued his new policy to take effect in FY 2002, he

had a constitutional duty to retroactively adjust the FY 2000 and 2001 wage indexes to avoid

discriminating against the same set of hospitals. *Id.* Neither challenge withstands rational basis

scrutiny. First, as demonstrated above, the statute did not require the Secretary to adopt a "hold

harmless" policy for urban, as opposed to rural areas. To the contrary, the statute explicitly

distinguished between the treatment of rural and urban hospitals, and the Secretary reasonably

applied that distinction. 56 Fed. Reg. at 431221.

  The Constitution permits the statutory distinction between rural and urban hospitals that

Congress created and the Secretary applied. Congress took the view that rural hospitals were in

need of special protection in PPS reimbursements. *See* 42 U.S.C. § 1395ww(d)(8)(B)(i),

(reclassification of rural counties); *Id.* at (d)(8)(C)(II) (rural "hold harmless" provision).

Congress plausibly could conclude that rural hospitals were in danger of underpayment, and choose to protect rural wage indexes to preserve access to care in rural areas. *See Federal Commc's Comm'n v. Beach Commc's, Inc.*, 508 U.S. 307, 313-14 (1993) ("Where there are plausible reasons for Congress' action, our inquiry is at an end") (internal quotation marks omitted). Congress need not have also enacted an urban "hold harmless" provision to avoid an equal protection violation. The Equal Protection Clause allows legislators to act "one step at a time, addressing itself to the phase of the problem which seems most acute." *Id.* at 316 (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)). Congress "need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." *Clements v. Fashing*, 457 U.S. 957, 969-70 (1982).

Second, as discussed above, the Secretary permissibly could change his policy without reopening and repaying past claim years. A prospective change in favor of a program participant does not automatically render the former policy a nullity, or constitutionally suspect. *See Clinton Hosp.*, 783 F. Supp. at 1440 (the Secretary has a legitimate interest in avoiding reprocessing claims after a change in the law). Ruling otherwise would be unworkable and contrary to basic administrative law. *See, e.g. Chevron*, 467 US at 863-64; *Smiley,* 517 U.S. at 742; *Motor Vehicle Mfrs. Assn. of United States, Inc.*, 463 U.S. at 42. In fact, retroactive rule making of the type Plaintiffs appear to envision is forbidden by the APA. *See Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988). Instead, the court should consider whether each policy legitimately drew lines at the time it was made. Since the old policy was constitutional, the Secretary had no injury to remedy after implementing the new one.

V.    PLAINTIFFS' PROPOSED ORDER IS BEYOND THE COURT'S JURISDICTION

Plaintiffs have submitted a very detailed proposed order requesting that the Secretary recalculate the urban wage index and Geographic Adjustment Factor based on a labor market that includes all urban hospitals located in Plaintiffs' MSAs for the base year for the FY 2000 and 2001 wage indexes (1996 and 1997, respectively) and that the Secretary pay Plaintiffs' FY 2000 and 2001 reimbursements using this recalculation of the wage index.  This Court is sitting essentially as an appellate court under 42 U.S.C. § 1395oo(f), which incorporates the APA standard of review of agency action.  Should it decide against the Secretary, the Court may enter an order describing the error, and remand this case to the Secretary for a decision that complies with the Court's order.  The Court lacks any further authority in this regard.  It is a well-established principle of administrative law that in an APA record review case such as this one, where a purported error of law is corrected by a reviewing court and the only questions remaining have not yet been considered by the agency, the appropriate action is to remand to the agency so that it may exercise its authority.  *Presbyterian Hosp. of Dallas v. Harris*, 638 F.2d 1381, 1399 (5th Cir. 1981); *see also Fed. Power Comm'n v. Idaho Power Comm'n*, 344 U.S. 17, 20 (1952) ("[T]he function of the reviewing court ends when an error of law has been laid bare. At that point the matter once more goes to the agency for reconsideration"); *Co. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (where the record does not support the agency action, the proper course of action except in rare circumstances is to remand to the agency for additional investigation or explanation); *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 853 (9th Cir. 1997) (where the PRRB does not resolve a particular issue there is no final agency decision on that issue, and thus no jurisdiction to review that claim).  Here, no component of the

28

agency (including the PRRB, which granted the Plaintiffs' request for expedited judicial review because it lacked authority to decide the issue presented) has calculated the amount that would be due Plaintiffs should they prevail on their legal claims.  Therefore, if the Court agrees with Plaintiffs' position here, it should simply remand for the agency to recalculate the affected wage indexes in a manner consistent with the Court's opinion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant the Secretary's motion for summary judgment.  The material facts are not in dispute and the Secretary is entitled to judgment as a matter of law.

Dated: June 3, 2008                              Respectfully submitted,


                                        ____/s/_____
                                        JEFFREY A. TAYLOR
                                        United States Attorney
                                        D.C. Bar No. 498610


                                        ____/s/_____
                                        CHRISTOPHER B. HARWOOD
                                        Assistant United States Attorney
                                        United States Attorney's Office
                                        for the District of Columbia
                                        555 Fourth Street, N.W.
                                        Washington, D.C. 20530
                                        (202) 307-0372

      /s/

JOCELYN S. BEER
Attorney
U.S. Department of Health & Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Avenue S.W.
Room 5309
Washington, D.C. 20201
(202) 305-3564

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
      and Human Services

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ST. MICHAEL'S MEDICAL CENTER, )
et al., )
 )
   Plaintiffs, )
 )
   v. ) Case No. 1:07-cv-1484 (EGS)
 )
MICHAEL O. LEAVITT, Secretary, ) **ECF**
U.S. Department of Health )
  and Human Services, )
 )
   Defendant. )
_____)

<u>**ORDER**</u>

   Upon consideration of the parties' cross-motions for summary judgment, oppositions and

replies thereto, and the entire record herein, it is this ____ day of _____, 2008,

   ORDERED, that Plaintiffs' Motion for Summary Judgment be, and hereby is, DENIED;

and it is further

   ORDERED, that Defendant's Motion for Summary Judgment be, and hereby is,

GRANTED; and it is further

   ORDERED, that judgment be, and hereby is, entered in favor of Defendant and against

Plaintiff.

          _____
          EMMET G. SULLIVAN
          United States District Judge

Copy to: ECF Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ST. MICHAEL'S MEDICAL CENTER,   )
et al.,   )
   )
      Plaintiffs,   )
   )
      v.   )   Case No. 1:07-cv-1484 (EGS)
   )
MICHAEL O. LEAVITT, Secretary,   )   **ECF**
U.S. Department of Health   )
   and Human Services,   )
   )
      Defendant.   )
_____)

### DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, hereby responds to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue (Plaintiffs' Statement) in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

Defendant avers that, to the extent that the parties disagree as to the facts underlying the present action, those disagreements are not material. All the material facts found by the agency are in the record, and under the Medicare statute, 42 U.S.C. § 1395oo(f)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2), the facts found by the agency are reviewed to determine whether they are supported by substantial evidence as a whole. Nevertheless, responding specifically to the numbered paragraphs of Plaintiffs' Statement and using the same paragraph numbering, Defendant responds to the following specific assertions in Plaintiffs' Statement:

1-2.    These paragraphs are not disputed.

3.      The first sentence of this paragraph is not disputed.  The second sentence is disputed.  The sole issue is whether federal law mandated that the Secretary include reclassified hospitals located in the Plaintiffs' geographic area in the wage index calculation for the remaining hospitals.  Administrative Record at 1.  The third sentence is not disputed.

4.      The first sentence of this paragraph is not disputed.  The second sentence is disputed.  During the time period at issue in this case, the Centers for Medicare and Medicaid Services (CMS) contracted with entities known as fiscal intermediaries to assist the Secretary in carrying out various functions under Part A of the Medicare Program.  42 U.S.C. § 1395h (1999).  The third sentence is not disputed.

5.      The first and second sentences of this paragraph are not disputed.  The third sentence is disputed.  In calculating a hospital's PPS payment for an individual discharge, the Secretary adjusts the labor related portion of the standardized amount by the wage index for the area in which the hospital is located or to which it is reclassified.  42 U.S.C. § 1395ww(d)(3)(E)(i), (d)(8), (d)(10)(C).  The fourth sentence is not disputed.  The fifth sentence contains Plaintiffs' characterizations of a case decision, not a material fact.

6-7.      These paragraphs contain conclusions of law and Plaintiffs' characterizations of the Medicare statute, regulations, and case decisions, not material facts.

8.      The first sentence of this paragraph contains a characterization of a case decision, not a material fact.  The second sentence is not disputed.

9.      This paragraph contains conclusions of law and Plaintiffs' characterizations of the Medicare statute, regulations, and case decisions, not material facts.

10.      The first and second sentences of this paragraph contain Plaintiffs'

2

characterization of the Medicare statute, not material facts. The third sentence is disputed as to the suggestion that the policy adopted by the Secretary for federal fiscal year 2002 was adopted "evermore." The Secretary publishes rules governing PPS payments annually, and may revise this policy in the future if warranted. *See* 42 U.S.C. § 1395ww(d)(6). The fourth sentence of this paragraph is undisputed.

        11.     This paragraph is not disputed.

Dated: June 3, 2008                Respectfully submitted,

                        /s/
                JEFFREY A. TAYLOR
                United States Attorney
                D.C. Bar No. 498610

                        /s/
                CHRISTOPHER B. HARWOOD
                Assistant United States Attorney
                United States Attorney's Office
                for the District of Columbia
                555 Fourth Street, N.W.
                Washington, D.C. 20530
                (202) 307-0372

                        /s/
                JOCELYN S. BEER
                Attorney
                U.S. Department of Health & Human Services
                Office of the General Counsel
                Centers for Medicare & Medicaid Services Division
                330 Independence Avenue S.W.
                Room 5309
                Washington, D.C. 20201
                (202) 305-3564

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
        and Human Services