**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )
ST. MICHAEL'S MEDICAL           )
CENTER, *et al.*,               )
                                )
        Plaintiffs,             )
                                )
        v.                      )    Civil Action No. 07-2036 (EGS)
                                )    Civil Action No. 07-1484 (EGS)
KATHLEEN SEBELIUS,[1] Secretary )
of the Department of Health     )
and Human Services,             )
                                )
            Defendant.          )
_____)

<u>**MEMORANDUM OPINION**</u>

Plaintiffs are twenty-two urban hospitals seeking additional

reimbursement from the Secretary of Health and Human Services

("defendant" or the "Secretary") for inpatient services

plaintiffs provided to Medicare beneficiaries during fiscal years

("FY") 2000 and 2001.[2]  The parties filed cross motions for

summary judgment, which this Court referred to a magistrate judge

_____

[1] Pursuant to Federal Rule of Civil Procedure 25(d),
Secretary Sebelius, in her official capacity as the Secretary of
the Department of Health and Human Services, is automatically
substituted as the named defendant.

[2] This case was filed as two separate actions:  Civil
Action No. 07-2036, which addresses claims relating to FY 2000,
and Civil Action No. 07-1484, which addresses claims relating to
FY 2001.  On January 4, 2008, the Court granted the parties'
joint motion to consolidate the cases, and nothing substantive
has been filed in Civil Action No. 07-2036 since the filing of
the Administrative Record in February 2008.  Because Civil Action
No. 07-1484 is the operative case, all citations to the record in
this Memorandum Opinion reference that case unless otherwise
noted.

for a Report and Recommendation.  Now pending before the Court are the parties' objections to the Report and Recommendation. Upon careful consideration of the Report and Recommendation, the parties' objections and responses to objections, the cross motions, responses and replies thereto, the applicable law, the entire record herein, and for the reasons stated below, the Court rejects the magistrate judge's recommendations, **GRANTS** defendant's motion for summary judgment, and **DENIES** plaintiffs' motion for summary judgment.

## I.   BACKGROUND

### A.   Medicare Reimbursement and the Prospective Payment System

The Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, pays for covered medical services provided to eligible aged and disabled persons. Part A of the Medicare program authorizes payments for, among other things, certain inpatient hospital services.  *See id.* §§ 1395c, 1395d.  The Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration ("HCFA")) is the agency within the Department of Health and Human Services that has been designated by the Secretary to administer the Medicare program.  CMS, in turn, has delegated many of Medicare's audit and payment functions to fiscal intermediaries, who are generally private insurers.  *See*

*id.* § 1395h.

Although hospitals used to be reimbursed for their actual costs in treating beneficiaries (as long as those costs were reasonable), most hospitals are now reimbursed through the Prospective Payment System ("PPS").  *See id.* § 1395ww(d).  Under the PPS, hospitals are "paid fixed rates for providing specific categories of treatment, known as 'diagnosis related groups,' or 'DRGs.'"  *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 168 (2d Cir. 2006) (citing 42 U.S.C. § 1395ww(d)).  Medicare administrators develop these rates by setting a "standard nationwide cost rate – the 'federal rate' – based on the average operating costs of inpatient hospital services.  They then assign a weight to each category of inpatient treatment, or [DRG]."  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (internal citation omitted).  A hospital's final reimbursement per patient is determined by multiplying the patient's DRG and the federal rate, after that rate has been "standardized" by making adjustments based on a variety of factors. *See* 42 U.S.C. § 1395ww(d)(2)(C) (listing the factors used for standardization).

To account for regional variations in labor costs, the Secretary adjusts the labor-related portion of the federal rate by a geographically specific factor commonly referred to as the "wage index."  *See* 42 U.S.C. § 1395ww(d)(3)(E)(i).  Specifically,

§ 1395ww(d)(3)(E)(i) states that

> the Secretary shall adjust the proportion, (as
> estimated by the Secretary from time to time) of
> hospitals' costs which are attributable to wages and
> wage-related costs, of the DRG prospective payment
> rates computed under subparagraph (D) for area
> differences in hospital wage levels by a factor
> (established by the Secretary) reflecting the relative
> hospital wage level in the geographic area of the
> hospital compared to the national average hospital wage
> level.

*Id.; see also Robert Wood Johnson Univ. Hosp. v. Shalala*, 297

F.3d 273, 276 (3d Cir. 2002) ("The wage index compares the

average hourly wage for hospitals in a given geographic area with

the national average hourly wage, which in turn determines the

payment rate above or below the national average at which a

hospital is reimbursed.  The wage-index for an area generally

applies to all hospitals physically located within that

geographic area." (internal citation omitted)).

**B.  Geographic Classification, Reclassification, and
the Impact on the Wage Index**

For the purposes of the wage index, the Secretary classifies

a hospital as being located in either an urban or rural area

using Metropolitan Statistical Areas ("MSAs"), as defined by the

Executive Office of Management and Budget.  *See* 42 C.F.R. §

412.64.  Recognizing that these geographic classification

procedures impose a burden on some hospitals,[3] Congress amended

_____

[3]  The hospitals that tend to be most negatively impacted by
these classifications are those that compete for the same labor
pool with hospitals located in larger, urban areas with higher

4

the Medicare statute "to allow a hospital to seek reclassification from its geographically-based wage area to a nearby wage area for payment purposes if it meets certain criteria." *Robert Wood Johnson*, 397 F.3d at 276.  The current reclassification provisions permit a rural hospital that meets those criteria to reclassify as urban, and qualifying urban hospitals to reclassify either as rural or to another higher-wage urban area.  *See* 42 U.S.C. §§ 1395ww(d)(8)(B)(i) & (d)(10); 42 C.F.R. §§ 412.230-412.235.  Congress also created the Medicare Geographic Classification Review Board, a five-member entity that reviews reclassification applications and, based on the specified requirements, decides whether an applicant is eligible for reclassification.  *See* 42 U.S.C. § 1395ww(d)(10); 42 C.F.R. § 412.230.

Both Congress and the Secretary have recognized that hospital reclassification can substantially impact the wage index for both the geographic area from which a hospital originates and the new area into which the hospital classifies.  The Medicare program therefore provides for circumstances when the wage index data for an incoming rural hospital must be excluded from the

---

wage indexes.  *See Robert Wood Johnson*, 297 F.3d at 276 (describing the "inequitable results" caused by this situation); *Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1177 (D.C. Cir. 1994) ("[A] hospital that is in a rural area but must compete for labor with hospitals in a nearby urban area may be insufficiently reimbursed for the cost of providing services.").

wage index of the urban area it is entering.  42 U.S.C. §
1395ww(d)(8)(C)(i)(I)-(II).  Likewise, Congress implemented a
provision to prevent the wage index of a rural area from
decreasing when a hospital originating from that area
reclassifies into an urban area.[4]  *See id.* § 1395ww(d)(8)(C)(ii).
No such statutory provision exists for urban areas, but no
reclassification may result in the reduction of a wage index of
*any* county below that of the State's rural areas.[5]  *See id.* §
1395ww(d)(8)(C)(iii); *see also* Def.'s Objections to Magistrate
Judge's Report & Recommendation ("Def.'s Objections") at 5
("[T]he Act is silent with respect to how to calculate the wage
index for an urban area after a hospital has reclassified to
another area . . . .").  Plaintiffs in this lawsuit challenge the
Secretary's since-changed practice of calculating the wage index
for urban areas without including data from hospitals that have
reclassified into higher-wage areas.

### C.  Reclassification and Urban Wage Indexes

The Secretary annually publishes rules in the Federal
Register setting forth both the methodology for calculating the
wage index and the wage indexes themselves.  Beginning in 1991,

---

[4]  This is often referred to as a "hold harmless" provision,
because it ensures that hospitals in rural areas are "held
harmless" from the effects of a reclassification.  *See* Def.'s
S.J. Mem. at 7.

[5]  This is sometimes called the "rural floor."

the Secretary publicly acknowledged the increase in urban reclassifications and, through notice and comment rulemaking, considered various methods to calculate the wage index for urban areas in the wake of such reclassifications.  Despite proposals to implement a "hold harmless" provision for urban hospitals similar to the statutory provision in place for rural areas, the Secretary repeatedly declined to do so.  *See, e.g.*, 65 Fed. Reg. 47054, 47077 (Aug. 1, 2000) ("[E]xcept for those rural areas in which redesignation would reduce the rural wage index value, the wage index value for each area is computed exclusive of the wage data for hospitals that have been redesignated from the area for purposes of their wage index."); 56 Fed. Reg. 43196, 43221 (Aug. 30, 1991) ("[W]e considered . . . provid[ing] the same 'hold harmless' protection that the statute affords to rural areas when hospitals are reclassified from those areas.  That is, we considered providing that the wage index value for an urban area could not be reduced due to the reclassification of hospitals from that area.  However, we do not believe this action would be appropriate.").

In 2001, however, the Medicare Payment Advisory Commission ("MedPAC") issued a report to Congress recommending that the Medicare statute be amended to provide a "hold harmless" provision for urban areas.  *See* Def.'s S.J. Mem. at 10-11 (citing Medicare Payment Advisory Comm'n, Report to the Congress:

7

Medicare Payment Policy 82 (Mar. 2001), http://www.medpac.gov/
documents/Mar01%20Entire%20report.pdf ("MedPAC Report"), and
describing the contents of the report).  The report expressed
MedPAC's opinion that the Secretary had the authority to make
such a change by way of regulation, but noted that the agency had
been "reluctant" to do so.  MedPAC Report at 83 ("HCFA appears to
have the authority to make this change through regulation.
However, because the protection for nonreclassified
rural hospitals was enacted legislatively and Congress has not
legislated such protection for urban hospitals, HCFA has thus far
been reluctant to make the change itself.").

Shortly thereafter, the Secretary did in fact propose
implementing a "hold harmless" provision for urban areas, and
discussed the MedPAC Report and its findings in the proposed
rule.  *See* 66 Fed. Reg. 22646, 22678 (May 4, 2001).  The rule was
adopted in August 2001 and has been in effect since FY 2002.  *See*
66 Fed. Reg. 39828, 39865 (Aug. 1, 2001) ("Currently, the wage
index value for an urban area is calculated exclusive of the wage
data for hospitals that have been reclassified to another area.
For the FY 2002 wage index, we include the wage data for a
reclassified urban hospital in both the area to which it is
reclassified and the MSA where the hospital is physically
located.").

8

D.  **Administrative and Judicial Review**

To receive reimbursement for services, hospitals file "cost report[s]" with their intermediaries at the end of each fiscal year.  42 C.F.R. § 405.1801(b)(1).  Intermediaries then audit the reports and determine the reimbursement amount owed to the providers.  That determination is memorialized in a Notice of Program Reimbursement and issued to the provider.  *Id.* § 405.1803(a)(2).

A hospital or group of hospitals dissatisfied with an intermediary's reimbursement determination may file an appeal with the Provider Review Reimbursement Board ("PRRB").  *See* 42 U.S.C. § 1395oo(a)-(b).  The PRRB is "an administrative review panel that has the power to conduct an evidentiary hearing and affirm, modify, or reverse the intermediary's [reimbursement] determination."  *Your Home Visiting Nurse Servs., Inc. v. Shalala*, 525 U.S. 449, 451 (1999).  Additionally, both the statute and the corresponding regulations provide a mechanism for the PRRB to grant expedited judicial review ("EJR") where the PRRB determines that it lacks the authority to decide a legal issue:

> Providers shall . . . have the right to obtain judicial
> review of any action of the fiscal intermediary which
> involves a question of law or regulations relevant to
> the matters in controversy whenever the Board
> determines (on its own motion or at the request of a
> provider of services . . . ) that it is without
> authority to decide the question, by a civil action
> commenced within sixty days of the date on which

notification of such determination is received.

42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842(f)(1)(ii)

(noting that before issuing an EJR decision, the PRRB must

determine that it "lacks the authority to decide a specific legal

question relevant to the specific matter at issue because the

legal question is a challenge either to the constitutionality of

a provision of a statute, or to the substantive or procedural

validity of a regulation or CMS Ruling").

### E. Factual and Procedural Background

Plaintiffs are hospitals located in multiple MSAs in New

Jersey, New York, and Connecticut from which at least one

hospital has classified to another area.  *See* Compl. ¶¶ 3, 15.

In FY 2000 and 2001, plaintiffs submitted cost reports to their

fiscal intermediaries requesting reimbursement.  Def.'s Statement

of Material Facts as to Which There is No Genuine Issue ("Def.'s

Statement") ¶ 3.  Plaintiffs were dissatisfied with their Notices

of Program Reimbursement because they believed that the data from

reclassified hospitals was improperly omitted from the wage-

index calculation, the exclusion of which resulted in reduced

reimbursements.[6]  Def.'s Statement ¶ 4; Compl. ¶¶ 15, 20.

---

[6]  Plaintiffs claim that recalculating the wage index with
data from the reclassified hospitals "would result in an increase
of [plaintiffs'] collective reimbursement of approximately
$23,956,069" for FY 2001 and approximately $20,588,699 for FY
2000.  Compl., Civil Action No. 07-1484, at 14; Compl., Civil
Action No. 07-2036, at 14.

On appeal to the PRRB, plaintiffs requested (1) consolidation into group appeals for FY 2000 and 2001, and (2) EJR.  *See* Def.'s Statement ¶ 5; Admin. Record ("AR") at 432-33. The PRRB determined that EJR was appropriate in both cases because the PRRB was "without the authority to decide the legal question" presented by plaintiffs' challenge to the reimbursement determination.  AR at 2.  Specifically, the PRRB noted that plaintiffs were not seeking the type of relief – "correction of [plaintiffs'] own wage data" – that PRRB could provide.  AR at 2. "Rather, they are seeking to have the wages of reclassified hospitals included in their wage index calculation."  AR at 2. Because such a remedy would require an evaluation of the lawfulness of the Secretary's interpretation of the Medicare statute, the PRRB concluded that EJR was appropriate.  AR at 2.

As required by 42 U.S.C. § 1395oo(f)(1), plaintiffs filed the instant complaints within sixty days of the PRRB's respective EJR determinations.  After the cases were consolidated in this Court, the parties filed cross motions for summary judgment.  In December 2008, the Court referred the case to a magistrate judge for a Report and Recommendation.  The magistrate judge filed her Report and Recommendation on March 19, 2009, recommending that both motions for summary judgment be denied and that the action "be remanded to the Secretary for the articulation of findings, as to each provider which is a Plaintiff in this action, with

respect to what 'adjustment' was made pursuant to 42 U.S.C. § 1395ww(d)(3)(E)."  Report & Recommendation at 9.

In reaching this recommendation, the magistrate judge reasoned that "the absence from the administrative record of any indication of how CMS interpreted and applied 42 U.S.C. § 1395ww(d)(3)(E)" prevented judicial review of a final agency action.  *Id.* at 6.  The Report and Recommendation thus concluded that "[i]n the absence of any record in the administrative record of what determination CMS made with respect to the adjustments, and what factors were considered in making such adjustments, the court has no basis upon which to determine whether CMS's determinations were contrary to law, or otherwise arbitrary and capricious."  *Id.* at 6-7.  Noting that calculating the reimbursement rates applicable to plaintiffs "would require a virtually trial-like proceeding for the resolution of the disputed factual issues," the magistrate judge instead recommended that the case be remanded to the agency for further factual development of the record.  *Id.* at 7.

Both plaintiffs and defendant have filed objections to the Report and Recommendation.  Those objections have been fully briefed and are now ripe for decision.

## II.  **Report and Recommendation**

Both parties object to the Report and Recommendation's findings that (1) the administrative record does not make clear

how CMS calculated the wage indexes challenged in this case or "what factors were considered in making such adjustments," Report & Recommendation at 6; and (2) the record does not contain sufficient information about the financial impact of the Secretary's calculations on the amount of plaintiffs' reimbursement, *see id.* at 7. More generally, the parties object to the Report and Recommendation's conclusion that the PRRB's decision does not constitute a final action, and agree that remand is unnecessary because the PRRB properly granted EJR.

"When a party files written objections to any part of the magistrate judge's recommendation with respect to a dispositive motion, the Court considers *de novo* those portions of the recommendation to which objections have been made, and 'may accept, reject, or modify the recommended decision[.]'" *Robinson v. Winter*, 457 F. Supp. 2d 32, 33 (D.D.C. 2006) (quoting Fed. R. Civ. P. 72(b)). Upon careful review of both the Report and Recommendation and the parties' objections thereto, the Court respectfully disagrees with the magistrate judge's determination that remand is necessary to develop the factual development in this case.

As noted by the parties, "the sole issue" before this Court is a legal question – whether the Secretary's practice of excluding data from reclassified hospitals in calculating the wage indexes for the hospitals remaining in those urban areas

violated 42 U.S.C. § 1395ww(d)(3)(E).  Pls.' Statement of
Material Facts as to Which There is No Genuine Issue ("Pls.'
Statement") ¶ 3; *see also* Def.'s Response to Pls.' Statement of
Material Facts as to Which There is No Genuine Issue ¶ 3 ("The
sole issue is whether federal law mandated that the Secretary
include reclassified hospitals located in the Plaintiffs'
geographic area in the wage index calculation for the remaining
hospitals.").  The parties do not dispute that this data was in
fact excluded from the FY 2000 and 2001 calculation of the wage
indexes for plaintiffs' geographic areas, and, as the parties
explain in their summary judgment briefing and respective
objections, the Secretary's reasons for maintaining the
challenged policy were explained in detail in the Federal
Register.  *See, e.g.*, 56 Fed. Reg. 43196, 43221 (Aug. 30, 1991)
(explaining why the Secretary was rejecting proposals to
implement a "hold harmless" provision for urban hospitals).

The Report and Recommendation correctly notes – and the
parties fully acknowledge – that the administrative record does
not contain factual information sufficient to determine the
precise amount of additional reimbursement to which plaintiffs
would be entitled if they were to prevail in their legal
argument.  *See* Pls.' Objections at 9-10 (explaining that some of
the relevant information is in the administrative record, but
acknowledging that the Secretary and/or intermediary would have

to recalculate the exact amount at issue); Def.'s Objections at 11-12 (noting that the administrative record "contains little beyond the documents needed to establish the PRRB's jurisdiction over each of the Plaintiffs").  But this deficiency in the record does not create a material factual dispute preventing the Court from resolving the legal question raised here.[7]

Moreover, the PRRB's determination that it lacked the authority to decide the legal question raised by plaintiffs was in full compliance with 42 U.S.C. § 1395oo(f)(1), which explicitly contemplates the situation presented by this case. *See Hunterdon/Somerset 2001 Wage Index Group v. Riverbend Gov't Benefits Adm'r*, PRRB Hearing Dec. No. 2004-D13, Case No. 01-1881GE (Apr. 14, 2004), AR at 438 (finding, on its own motion, that EJR was warranted because "the facts material to the issue are not in dispute.  The questions posed by the Providers as requiring Board resolution are questions regarding how CMS's policy is made.  The Board has no authority to dictate or fashion

_____

[7] The parties' briefing on both the cross motions and the objections to the Report and Recommendation includes considerable argument relating to the propriety of plaintiffs' proposed order, which specifically directs the Secretary to recalculate the wage index in a particular way and orders the Secretary to reimburse plaintiffs using these new calculations.  Notwithstanding this dispute, however, the parties agree that if plaintiffs were to prevail on the merits, the case would have to be remanded to the agency to recalculate the wage indexes.  And because, as discussed below, the Court concludes that defendant is entitled to summary judgment, further consideration of plaintiffs' proposed order is unnecessary.

CMS policy or to retroactively apply policy changes."); *see also Robert Wood Johnson*, 297 F.3d at 279-80 (acknowledging the court's jurisdiction after the PRRB granted EJR; noting that the court's review was "limited to the issue before the PRRB regarding the Secretary's interpretation" of the statute relevant in that case).  Because 42 U.S.C. § 1395oo(f)(1) has been properly invoked, the PRRB's EJR decision constitutes a final decision, *see* 42 C.F.R. § 405.1842(h)(1), and plaintiffs "have the right to obtain judicial review" of the calculation of their wage index for FY 2000 and 2001, "which involves a question of law or regulations relevant to the matters in controversy."  42 U.S.C. § 1395oo(f)(1).  This Court therefore rejects the magistrate judge's recommendation and will proceed to address the merits of the parties' cross motions for summary judgment.

## III.  SUMMARY JUDGMENT

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable

to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).[8]

Plaintiffs' principal claim is that the Secretary exceeded her statutory authority and that her actions must be set aside pursuant to 5 U.S.C. § 706(2)(C), which permits a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  As the D.C. Circuit has explained, "[i]n examining the Secretary's interpretation of a statute that she administers, the court applies the familiar methodology of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)."  *Methodist Hosp. of Sacramento*, 38 F.3d at 1229.  The court's first question must be "whether Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

---

[8]   The parties here agree that there are no material facts in dispute.  They vigorously dispute, of course, which side is entitled to judgment as a matter of law.

unambiguously expressed intent of Congress." *Id.* at 842-43.

The court moves to the second step of *Chevron* only "if the statute is silent or ambiguous with respect to the specific issue." *Id.* at 843. Under those circumstances, the court must consider whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* If so, then the court "must defer to the Secretary's" interpretation. *Methodist Hosp. of Sacramento*, 38 F.3d at 1229. Where Congress has implicitly delegated authority to the agency to fill a gap left in the statutory framework, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844.

Finally, "in framing the scope of review, the court takes special note of the tremendous complexity of the Medicare statute. That complexity adds to the deference which is due to the Secretary's decision." *Methodist Hosp. of Sacramento*, 38 F.3d at 1229 (giving heightened deference to the Secretary's policy of denying retroactive effect to a revised wage index); *see also Robert Wood Johnson*, 297 F.3d at 282 ("The broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which "require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns.'"

18

(quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512
(1994) (additional citations omitted))).

**B.   42 U.S.C. § 1395ww(d)(3)(E)(i) Does Not Speak to
the Precise Question at Issue**

Plaintiffs challenge the Secretary's exclusion of wage data
of reclassified hospitals from the calculation of their wage
indexes under § 1395ww(d)(3)(E)(i).  As noted above, the statute
requires the Secretary to

> adjust the proportion . . . of the DRG prospective
> payment rates computed under subparagraph (D) for area
> differences in hospital wage levels by a factor
> (established by the Secretary) reflecting the relative
> hospital wage level *in the geographic area of the
> hospital* compared to the national average hospital wage
> level.

(Emphasis added.)

Plaintiffs argue that this provision is "clear and
unambiguous" in requiring the Secretary to include the wage data
of reclassified hospitals, which are "by definition 'in the
geographic area' of" plaintiff hospitals, in the calculation of
the wage index.  Pls.' Mem. at 6-7.  In support of this argument,
plaintiffs rely heavily on two cases:  *Bellevue Hospital Center
v. Leavitt*, 443 F.3d 163 (2d Cir. 2006), and *Anna Jacques
Hospital v. Leavitt*, 537 F. Supp. 2d 24 (D.D.C. 2008).[9]  As
discussed below, neither of these cases supports plaintiffs'
position.

_____

[9]  The *Anna Jacques* decision is currently on appeal to the
D.C. Circuit.  *See* Case Nos. 08-5407 and 08-5529 (D.C. Cir.).

In *Bellevue*, the Second Circuit addressed two issues. First, it considered and rejected the plaintiff hospitals' challenge to the agency's use of MSAs in defining the "geographic areas" referred to in § 1395ww(d)(3)(E)(i).  At the outset, the *Bellevue* court acknowledged that the agency's "task" under § 1395ww(d)(3)(E)(i) "is unambiguous: to calculate a factor that reflects geographic-area wage-level differences, and nothing else."  443 F.3d at 174.  Plaintiffs in this case take this conclusion to mean that "the first sentence of § 1395ww(d)(3)(E)(i) is unambiguous, period."  Pls.' Reply at 5.

Plaintiff's reliance on *Bellevue*, however, fails to account for the remainder of the *Bellevue* court's discussion regarding the term "geographic area":

> At the same time, . . . the statute leaves considerable ambiguity as to the term "geographic area," which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block.  CMS's discretion in interpreting this ambiguous term is cabined by the need to fulfill two somewhat contradictory policies . . . : (1) the geographic areas must be small enough to actually reflect differences in wage levels and, (2) each geographic area must include enough hospitals that their costs can be meaningfully averaged and individual hospitals do not get reimbursed for their own actual costs.  In balancing these two considerations, the agency has considerable discretion.  Moreover, even after determining the scale of each geographic area, lines must be drawn between areas that inevitably will be contested and may seem arbitrary; *once again, the statute is silent as to how this process is to take place, leaving the agency with broad discretion*.

*Bellevue*, 443 F.3d at 175 (emphasis added); *see id.* (concluding

that "the use of MSAs to fill the gap left by the ambiguous term 'geographic areas' is reasonable").

To the extent that *Bellevue*'s reasoning is applicable in the present case, it actually undermines plaintiffs' position that § 1395ww(d)(3)(E)(i) unambiguously requires the Secretary to include particular hospitals in calculating "the relative hospital wage level in the geographic area" of plaintiff hospitals.  Just as the *Bellevue* court concluded that § 1395ww(d)(3)(E)(i) leaves discretion to the agency to use MSAs in determining the geographic area of a hospital for the purposes of the wage index, so too does the statute leave open the question of whether a hospital should be treated as located "in the geographic area" from which it has reclassified.

The second issue addressed in *Bellevue* – whether the agency acted arbitrarily and capriciously in collecting certain data relating to the occupational mix of employees – is simply irrelevant to the case at bar.  Plaintiff's reliance on *Anna Jacques* is misplaced for the same reason.  Indeed, although *Anna Jacques* addressed the wage index under § 1395ww(d)(3)(E)(i), that case concerned the agency's interpretation of its obligation under the second sentence of the statutory provision to gather data for use in the calculation of wage indexes.  *See* § 1395ww(d)(3)(E)(i) ("[T]he Secretary shall update the factor under the preceding sentence on the basis of a survey conducted

21

by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States."). Specifically, the *Anna Jacques* court considered the scope of the Secretary's discretion to determine what types of hospitals should be included in the survey that the Secretary is required to conduct before updating the wage index. *See* 537 F. Supp. 2d at 31 (concluding that the statute did not give the Secretary discretion to exclude critical access hospitals from the survey, because "the plain language of the statute indicates that Congress required the Secretary to conduct an accurate survey of the wages and wage-related costs of subsection (d) hospitals," and exclusion of critical access hospitals would not "faithfully reflect" that information). *Anna Jacques* thus addressed an entirely different part of § 1395ww(d)(3)(E)(i), one that deals with the *collection* of wage-index data rather than the *calculation* of a wage index after that data has been gathered. Accordingly, the *Anna Jacques* court's holding that the second sentence of the statute is unambiguous does not shed light on whether or not the first sentence of the statute clearly requires the Secretary to include the data from reclassified hospitals in its calculation.

Reading the statutory framework as a whole reinforces the conclusion that § 1395ww(d)(3)(E)(i) does not unambiguously require the Secretary to include reclassified hospitals in the

geographic area where they are physically located.  Of particular
note in this regard are the other subsections of § 1395ww(d) that
explicitly (1) "hold harmless" rural hospitals,
§ 1395ww(d)(8)(C)(ii); and (2) set the "rural floor" below which
no wage index may fall as a result of reclassification,
§ 1395ww(d)(8)(C)(iii).  Plaintiffs' reading of §
1395ww(d)(3)(E)(i) would render these subsections superfluous,
because § 1395ww(d)(3)(E)(i) would already protect against the
concerns addressed by those provisions.  *See TRW Inc. v. Andrews*,
534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory
construction that a statute ought, upon the whole, to be so
construed that, if it can be prevented, no clause, sentence, or
word shall be superfluous, void, or insignificant." (internal
quotation marks omitted)).

In sum, the Court agrees with the Secretary that 42 U.S.C.
§ 1395ww(d)(3)(E)(i) does not clearly address how the Secretary
must treat wage data from hospitals that have reclassified to a
different area in calculating the wage index.  *See* Def.'s S.J.
Mem. at 16.  Although § 1395ww(d)(3)(E)(i) unambiguously requires
the Secretary to "establish" a "factor" that reflects "the
relative hospital wage level in the geographic area of the
hospital," the language leaves substantial discretion to the
Secretary in determining what constitutes both the "relative wage
level" and the relevant "geographic area."  *Cf. Bellevue Hosp.*

*Ctr.*, 443 F.3d at 174.  The Court must therefore proceed to the second step of *Chevron* to consider whether the Secretary's policy of excluding data from reclassified hospitals from the calculation of plaintiffs' wage indexes was based on a "permissible construction" of § 1395ww(d)(3)(E)(i).

### C.  The Secretary's Interpretation is Reasonable

Having concluded that the statute does not address the precise question at issue, the Court must consider whether the Secretary's interpretation of § 1395ww(d)(3)(E)(i) was reasonable and, if so, must defer to that interpretation.  *See Chevron*, 467 U.S. at 843.  Plaintiffs rely primarily on the Secretary's decision to implement the "hold harmless" provision for FY 2002 in arguing that the agency's prior practice of excluding the wage data of reclassified hospital was based on an impermissible construction of § 1395ww(D)(3)(E)(i).  Put differently, plaintiffs claim that because the Secretary was able to effectuate the change in wage-index calculation without a change to the statutory or regulatory framework, the statute must have already required the inclusion of reclassified hospitals as part of the "geographic area."

The Secretary responds that because the statute is silent as to the inclusion of reclassified hospitals' wage data, the agency was not only permitted to change its practice but was required to do so when information gained through the administration of the

24

program led the Secretary to conclude that inclusion of the data was the preferable approach.  Here the Secretary relies on a long line of cases, including *Chevron*, recognizing that an agency should not be prevented from adapting its policies when circumstances counsel in favor of such a change.  *See* Def.'s S.J. Mem. at 23 (citing cases).  Indeed, the Supreme Court in *Chevron* made this point particularly clearly:

> An initial agency interpretation is not instantly carved in stone.  On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.  Moreover, the fact that the agency has adopted different definitions in different contexts adds force to the argument that the definition itself is flexible, particularly since Congress has never indicated any disapproval of a flexible reading of the statute.

467 U.S. at 863-64; *see also Smiley v. Citibank (South Dakota) N.A.*, 517 U.S. 735, 742 (2001) ("[T]he mere fact that an agency interpretation contradicts a prior agency position is not fatal. . . . [C]hange is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.").

The Court rejects plaintiffs' attempt to fault the Secretary for doing precisely what the *Chevron* Court envisioned – evaluating "the wisdom of [the agency's] policy on a continuing basis."  Indeed, the Federal Register passages repeatedly referenced and discussed by the parties make clear that the Secretary carefully considered whether the Medicare statute

should be interpreted to include a "hold harmless" provision for urban hospitals.  The Secretary originally rejected this interpretation because of the concern that including reclassified hospitals in their original labor markets would (1) disrupt the statutory scheme, which specifically enumerated the circumstances under which reclassified hospitals should be included in the calculations of their originating geographic area; and (2) negatively impact the majority of hospitals by requiring that the overall standardized rate be reduced to comport with a budget-neutrality requirement contained in the statute.  *See* 56 Fed. Reg. at 43221.

When the agency reevaluated this interpretation in 2001, its rationale for doing so was clearly explained.  The Secretary noted that including the data of reclassified hospitals in "the MSA where the hospital is physically located . . . . improves consistency and predictability in hospital reclassification and wage indexes, as well as alleviates the fluctuations in the wage indexes due to reclassifications."  66 Fed. Reg. at 39865. Moreover, the Secretary explained that reclassified hospitals may continue to compete for labor with the other hospitals in their MSA, and that their higher wages could pressure neighboring hospitals to increase their wages accordingly.  *Id.* at 39866. These considerations, in addition to the conclusion that the Secretary had the authority to make this change through

26

rulemaking, found support in the MedPAC Report which was cited and discussed in the proposed rule.

Plaintiffs repeatedly assert that only the Secretary's 2001 interpretation is reasonable, but they fail to point to anything about the agency's prior interpretation of the statutory scheme that was either unreasonable or arbitrary.[10]  As noted above, the mere fact that the agency reevaluated the impact of its policy and changed its practice does not render the prior interpretation unreasonable.  It is also significant that – despite a number of congressional amendments to 42 U.S.C. § 1395ww(d) during the period that the agency enforced its policy of excluding reclassified hospitals from the calculation of the wage indexes of the urban areas in which those hospitals were physically located – Congress never questioned or otherwise addressed the policy.  *See Chevron*, 467 U.S. at 864 (pointing out that Congress's failure to "indicate[] any disapproval of a flexible reading of the statute" supports the conclusion that "the definition itself is flexible").  Because the Court concludes that the Secretary's policy of excluding reclassified hospitals

---

[10]  Plaintiffs focus on a few particular words in the 2001 Federal Register notice, claiming that the Secretary's choice of words either (1) proves that the Secretary knew its prior practice was unlawful, and/or (2) constitutes an admission under the Federal Rules of Evidence.  Defendant's briefing persuasively demonstrates why these arguments are utterly lacking in merit, and the Court will not address plaintiffs' contentions any further.

from plaintiffs' wage-index calculations constituted a permissible construction of the statute, the Secretary's interpretation is entitled to deference.  Therefore, plaintiffs' challenge under 5 U.S.C. § 706(2)(C) fails.

### D.  Additional Claims

Plaintiffs also contend that the Secretary's exclusion of reclassified hospitals from the wage index calculations in FY 2000 and 2001 (1) violated 42 C.F.R. § 413.5(b)(3); (2) was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A); and (3) violated plaintiffs' rights to equal protection.[11]  These arguments are not well-developed in the parties' submissions and, as explained briefly below, are without merit.

Section 413.5(b)(3) of Title 42 of the Code of Federal Regulations is a regulation which states "[i]n general terms" that one goal of reimbursement should be to create "a division of the allowable costs between the beneficiaries of [the Medicare] program and the other patients of the provider that . . . is fair to each provider individually."  Plaintiffs conclusorily state that the Secretary's challenged policy was unfair to the

---

[11]  Plaintiffs state that defendant's policy violates "the Equal Protection Clause," but never specify what constitutional provision this claim is based upon.  The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution does not apply to the federal government.  Therefore, any constitutional claim against defendant based on equal protection principles would be cognizable only under the Due Process Clause of the Fifth Amendment.

individual hospitals, but fail to explain how or why this particular regulation applies in the present case or how the regulation confers any enforceable legal rights upon plaintiffs. For these reasons, the Court rejects this claim.

Despite the distinct legal standards, plaintiffs make one combined argument that the Secretary's policy (1) was arbitrary and capricious and (2) violated their constitutional rights to equal protection.  With respect to the claim based on 5 U.S.C. § 706(A)(2), plaintiffs argue that the Secretary failed to fulfill the statutory purpose of § 1395ww(d)(3)(E)(i) and that the negative impact on plaintiff hospitals renders the Secretary's practice arbitrary and capricious.  *See* Pls.' Mem. at 22-24.  The D.C. Circuit has recognized that the arbitrary and capricious standard often "overlaps" with the second step of *Chevron*, because "whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable."  *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 96 (D.C. Cir. 2005) (alteration and internal quotation marks omitted)).  Here, plaintiffs' arguments under the arbitrary and capricious standard map directly onto the arguments that this Court has already addressed and rejected in discussing the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(3)(E)(i). These arguments need not be revisited.

Finally, as the Secretary points out, an equal protection

challenge to the Medicare regulations is appropriately evaluated under the rational-basis standard.  *See Clinton Mem. Hosp. v. Sullivan*, 783 F. Supp. 1429, 1440 (D.D.C. 1992) (applying a "deferential standard" to an equal protection challenge to a Medicare regulation, and explaining that "the challenged statute or regulation will be struck down only if it 'manifests a patently arbitrary classification, utterly lacking in rational justification'" (quoting *Weinberger v. Salfi*, 422 U.S. 749, 768 (1975))), *aff'd sub nom. Clinton Mem. Hosp. v. Shalala*, 10 F.3d 854, 860-61 (D.C. Cir. 1993).  Plaintiffs contend that there was no valid reason to treat urban and rural hospitals differently, or to reimburse similarly situated hospitals at different levels before and after FY 2002.  They do not challenge, however, the Secretary's proffered justifications for distinguishing between urban and rural hospitals or for not applying the change in the calculation of the wage indexes retroactively.  Indeed, plaintiffs do not address their equal protection claim at all in their reply brief.  And because the Secretary's proffered reasons "sufficient to justify any disparate treatment," *id.*, plaintiffs' constitutional claim must fail.

## IV.  CONCLUSION

Accordingly, for the reasons stated, the Court **GRANTS** defendant's motion for summary judgment and **DENIES** plaintiffs' motion for summary judgment.  An appropriate Order accompanies

this Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
            **United States District Judge**
            **August 26, 2009**